# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF PENNSYLVANIA

WARREN EASLEY,

      Plaintiff,

      v.

DEPUTY ROWE, *et al.*,

      Defendants.

CIVIL ACTION NO. 3:25-cv-01186

(SAPORITO, J.)

## MEMORANDUM

Plaintiff Warren Easley has filed a *pro se* complaint alleging that 47 defendants affiliated with SCI-Rockview have engaged in a campaign of retaliation and abuse against him. Pursuant to 28 U.S.C. § 1915A, the Court will permit Easley to proceed against 31 defendants on First and Eighth Amendment claims, state law medical negligence claims, and a claim under the Americans with Disabilities Act.

## I. BACKGROUND

Easley's complaint (Doc. 1) alleges as follows: On February 7, 2023, he entered into a settlement agreement with the Pennsylvania Department of Corrections, under which he would be placed on the

Restricted Release List ("RRL")[1] within the Behavioral Management Unit ("BMU") at SCI-Rockview, but the DOC would "provide [Easley] with a path off RRL in 'good faith'." Easley's grievances broadly fall into four categories: unsafe conditions of confinement, excessive force during his medical care, deliberate indifference to his threats and attempts of suicide, and objections to his custody status within the BMU.

## A. Conditions of Confinement

On March 8, 2023, Easley was transferred to SCI-Rockview, and "began to challenge his conditions by filing grievances." The vents in his cell were inoperable, contained mold and dust, and had not been cleaned "in decades." Easley thus had no heat or air conditioning in his cell, and he was not provided blankets or permitted to purchase a fan. His cell smelled of feces, urine, and body odor due to the lack of ventilation.

On March 19, 2023, Easley wrote to defendant Seymore "about air quality in cells and it being freezing cold at night." Seymore allegedly

---

[1] The RRL "is intended to be the final recourse for those inmates who have proven themselves to be an unmanageable threat to others, the facility, and/or the public." The inmate is placed in administrative custody status and the procedure for restoration of privileges is more stringent than for other inmates. *See* DC-ADM 802, Department of Corrections Administrative Custody Procedures Manual, § 1.C; *Nifas v. Beard*, 374 F. App'x 241, 243 n.1 (3d Cir. 2010).

replied: "You['re] at an old jail, what [do] you expect." On March 24, Easley wrote to "Fire and Safety" regarding the lack of ventilation, but "to no avail." He wrote requests and spoke to defendants Salamon, Rowe, and Woodring about these issues, all "to no avail." He also spoke to defendant Miller, who allegedly replied "deal with it." These conditions generally continued from March 2023 through October 2024.

In addition, between June 19 and July 10, 2023, Easley was placed in a "hard cell," which was intentionally "never cleaned." The cell was "filled with feces, urine and blood," and Easley was denied cleaning supplies. Easley "could not sleep" because of the smell, "constant illumination," and "bugs everywhere." Easley alleges that the heat index in the cell was "well above 90" due to the time of year and the lack of ventilation. It was "difficult to breathe" in the cell, "which defendant[s] Salamon, Rowe, Woodring, Miller, and [Vogt were] well aware of and failed to remedy." Easley spoke to Miller and wrote to Rowe, Woodring, and Miller about the hard cell, all "to no avail."

On August 11, 2023, Vogt told Easley that Miller, Rowe, and Woodring were again placing Easley in a hard cell in retaliation for filing grievances and for achieving a settlement with the DOC. Vogt allegedly

said: "See if your lawyer or settlement get you out of this one . . . You will be placed on all restrictions. File a lawsuit on that." This second hard cell, where Easley was held for three days, had similar sanitation issues to the first. Easley was further "denied a mattress, blankets, hygiene, shower, toilet paper or any legal work," as well as yard time. In addition, defendant Frank placed Easley on "finger food diet restriction," which was contrary to his medically prescribed diet. Even after he left the hard cell, his medical diet was not restored until August 18, "without explanation." Easley lost weight because he could not eat some of the food provided.

### B. Excessive Force

Easley asserts six separate incidents of excessive force in connection with his medical care.

First, on June 16, 2023, Easley was recovering from foot surgery and was under doctor's orders to stay off his feet. He was escorted to the medical department in a wheelchair by defendants Hummel, Groth, and Sergie, and received by defendants Weber, Stryker, and Nurse Dawn. Easley, who was "famished" because he had fasted prior to surgery, requested food. An argument ensued, during which Weber allegedly said:

"You will not come up here making demands[,] boy . . . You['re] lucky I didn't call you monkey boy." Weber allegedly "began to punch [Easley] in [the] head and neck area," knocking him out of his wheelchair. Weber jumped on Easley, placed him in a headlock, "and began to twist and jerk [Easley's] neck as if he was to break it." Weber then kicked Easley twice in the ribs. During this assault, which may have lasted as long as 80 minutes[2], Stryker, Hummel and Groth allegedly had "many opportunities" to intervene but failed to do so.

Next, on June 19, 2023, defendant Miller denied Easley access to a "handicap shower," even though Easley could "barely stand" due to his foot issues. Easley alleges that defendant Mauk failed to place a "medical hold" for the appropriate shower despite knowing of Easley's foot surgery and difficulty standing. Defendants Salamon and John Doe 10 were also aware or "should have known" of his need for a handicap shower.

Easley fell while using the "normal shower," injuring his hip and back. Defendants Burns, Smith, and MacIntyre arrived, but refused to provide a wheelchair. Easley, who was wearing a "cuff belt," was forced

---

[2] Although Easley's handwriting is difficult to decipher, he appears to allege that "[t]his assault continued for 60-80 m." *See* (Doc. 1, ¶ 129).

to walk from the shower, although it was painful to do so. Burns allegedly said: "Keep walking or I'ma dump you." Smith, Burns and MacIntyre allegedly "grabbed [Easley] by his legs [and] shoulders and slam[med] him on his head and shoulders." Smith allegedly put "all his weight" on Easley's chest, while John Does 1 through 4 "began to punch, kick and twist [Easley's] body." Defendant Rook allegedly "stood by and failed to intervene." Easley was then placed in a restraint chair, at which point MacIntyre stepped on Easley's shackles, "causing pain intentionally." The shackles were very tight, causing "unbearable pain," although officers are allegedly trained "not to place[] restraints over shackles." Further, Doe 1 "attempted to choke" Easley in the restraint chair, while Smith, Burns, MacIntyre, Rook, and Does 2 through 4 "failed to intervene."

Next, on July 3, 2023, Easley was escorted to the medical department by defendants Vogt, Richard, and Snyder. Vogt allegedly said: "Let the games begin!" and ordered Easley to face the wall, which he did. Vogt allegedly "banged [Easley's] head off the wall," saying: "There are no cameras up here p[*]ssy. I will do you like CO Weber did, we will kill you up here p[*]ssy." He also threatened to break Easley's fingers. Richard and Snyder allegedly "failed to intervene." Easley suffered

concussion symptoms, including migraines, from this incident.

Next, on July 6, 2023, defendant Sheesley was delivering lunch in Easley's unit, by serving food through slots in the cells. Easley and Sheesley became involved in an argument over how much food Easley was entitled to. Sheesley allegedly said: "I don't f[*]cking work down here[,] either take the [food] bag or nothing . . . stop acting like a b[*]tch." Easley then tried to grab his bag through the slot, and Sheesley allegedly "intentionally slammed [Easley's] left hand in the slot with brute force," causing "immense pain" and swelling.

On August 28, 2024, Easley was on a hunger strike. Defendant Sherman allegedly told Easley that he would be forced to accept medical treatment. Easley protested, and Sherman allegedly replied: "Deputy Rowe and Superintendent Salamon told us to come in and f[*]ck you up. Is this what you want[?]" Sherman, "by direction of" Rowe and Salamon, then approached Easley's door with an "armored team." Easley complied with an order to "come to the door and cuff up." Nonetheless, defendant John Doe 5 allegedly "slammed [Easley] to the bed by his neck," banged his head on the bed, and began choking him, while defendant John Doe 6 shackled Easley and punched him in the face. John Does 5 through 8

"began to punch and twist" Easley's body, and Doe 5 "bent [Easley's] body all the way to [his] knees," pushing down with "brute force." Easley suffered pain, swelling, and abrasions. Because of this assault, Easley was forced to comply with medical treatment, but he does not describe what that entailed beyond taking his vital signs.

Next, on October 1, 2024, Easley was in a restraint chair "due to self harm." Allegedly, Easley was supposed to receive "exercise" every two hours. However, at the scheduled time, Vogt arrived and told Easley: "[Y]ou should['ve thought of that before you sued me. You don[']t get no exercise." Easley allegedly received no exercise for more than six hours, "on the direction of" Rowe, Salamon, and Vogt. This caused pain and numbness in Easley's back, hips, and legs. Later that day, defendant McKaulley[3] placed Easley in a "kuffbag"[4] and an intermediate restraint

---

[3] Although not currently listed on the docket, McKaulley will be added as a defendant.

[4] Easley may be referring to a "KuFBag," which is described by its manufacturer as a "Straight Jacket for the Hands" to be used in conjunction with handcuffs. *See Gibson v. Mason*, No. 3:22-CV-1538, 2025 WL 1932743, at *2 n.3 (M.D. Pa. July 14, 2025) (citation omitted).

system[5] "by direction of" Meyers, Rowe, Woodring, and Salamon, even though using both restraint systems simultaneously is "against policy."

Easley alleges that various defendants assaulted him while he was in these restraints. Defendant Fye allegedly "threw [Easley] over the bed"; defendants Thompson, Tom and Bagrosky allegedly "twist[ed]" his body and used his shackles to "cut into" his skin; and defendant John Doe 9 allegedly punched him. Later that day, Thompson allegedly grabbed Easley's neck, threw him down, banged his head on the ground, and kneed him in the face; Fye allegedly "began to grab and twist [Easley's] testicles"; and other defendants in the group "failed to protect" Easley. Thompson allegedly sprayed Easley with O/C spray for 9-12 seconds even though Easley was not resisting, saying: "Nothing personal[,] just following captain[']s orders." McKaulley was allegedly "10 feet away watching but waited 15-20 minutes" to remove Easley from his cell after Thompson deployed the O/C spray.

---

[5] An intermediate restraint system "involves handcuffing the inmate in front and attaching the handcuffs to a belt that is fastened around his waist, which limits the inmate's ability to use his hands except for activities such as eating and drinking." *Taylor v. Nepolean*, No. 2:20-CV-1450, 2022 WL 1720336, at *2 (W.D. Pa. May 27, 2022) (citation omitted).

### C. Suicide Risk

Next, Easley alleges that he repeatedly attempted suicide between June and September 2024, and various defendants failed to provide appropriate medical care or were otherwise deliberately indifferent to the ongoing risk.

In March 2023, Easley, who had an "extensive history of suicide attempts," arrived at SCI-Rockview in the "midst of a 'suicide cluster' of 4 suicides in 7 weeks." Upon arrival, he was "not afforded to see a psychiatrist per policy." Rowe, Salamon, and Woodring allegedly failed to enforce a policy requiring staff to visit inmates after a suicide in the facility. Easley "began to feel the effects of such and constantly had the thought of suicide."

On November 16, 2023, Easley told defendant Davis, a nurse practitioner, that he felt suicidal. Davis "oversees all medications [and] diagnosis and determines who will receive suicide prevention treatment." Davis allegedly "attempted to diminish how [Easley] felt" and "encourage[d] Easley to not tell anyone about his suicidal thoughts and to hang himself." Five days later, Davis refused to see Easley "until you respect Psych Wasson," although Easley does not describe his

interactions with Wasson.[6] Davis allegedly said: "I'm well aware of you suing MHM[,] that[']s who I work for. You[']re trying] to sue me. I know your game. If you was suicidal you wouldn[']t be here."

On April 19, 2024, Davis approached Easley's cell while he was contemplating suicide. He had cut his wrist, and Davis allegedly said: "It appears you did a little scratching cause you[']re mad . . . your cut is not deep enough." Another inmate was heard encouraging Easley to commit suicide, and Davis allegedly said "thanks." Davis then allegedly left Easley's cell while he was bleeding.

On May 30, 2024, Easley told Bowman that he was having thoughts of self-harm, and Bowman allegedly replied: "[H]ave at it . . . what else is new . . . all you do is write grievances and tell on everybody." Easley "was not afforded any mental health treatment" following his remarks to Bowman, and he cut his wrists "sometime later." Durst and Bowman then approached him and told him: "[D]on't request to see or speak to Bowman no more." Allegedly, they noticed the blood from Easley's cuts and "failed to go through proper channels and contact a CRNP or psychiatrist."

---

[6] Easley continually alleges that he was denied access to psychiatric care, but the complaint describes numerous interactions with psychiatry and other mental health staff.

On June 3, 2024, Easley was again "struggling with self-harm thoughts." Davis approached his cell, and allegedly said: "[W]hat are you crying about now . . . I[']m sitting here. I don[']t see no blood. Show me some blood[,] Easley . . . If you feel suicidal don[']t tell nobody just do it. Make life easier for us all." "Some time later," Easley was taken to another "hard cell," which had many of the sanitation issues described above, and attempted suicide. He was taken to the hospital and received nine stitches. When he returned on the same day, a nurse said that Davis "gave us all an order" not to place Easley in the Prisoner Observation Cell, where suicidal inmates are typically treated. Easley was placed back in the "torture cell," began to cut himself again, and returned to the hospital, where he received another four stitches. Two days later, Durst told Easley that any time he was suicidal, he would be punished and placed in this "recovery cell."

On September 29, 2024, Easley described suicidal thoughts to defendant Erin Smith[7], who allegedly laughed and told Easley that Davis had instructed nurses not to place him "on psych or mental health status

---

[7] Erin Smith, a nurse, is not the "Correctional Officer Smith" involved in prior allegations of excessive force described above.

when [he] is suicidal as [Davis] did not want to speak to him." Easley attempted suicide again and was taken to the hospital to receive six stitches. The following day, September 30, Easley voiced thoughts of self-harm to defendant Nurse Dawn, who allegedly replied: "Nadine Davis already let us know you will not be put on psychiatrist status and will not speak to a psychiatrist." Easley allegedly attempted suicide, and was taken to the hospital for stitches, two more times that day.

### D. BMU/RRL Status

Finally, Easley objects to the way he was evaluated within the BMU, but he does not clearly describe the process, or what status or privilege he believes he was entitled to. The Court infers that Easley was eligible to progress through various "phases" within the BMU, earning more privileges and less restrictive conditions of confinement, by meeting benchmarks related to his behavior and mental health. *See generally* Pa. DOC Reg. 13.8.1 ("Access to Mental Health Care"), § 12; *see, e.g.*, *Washington v. Durst*, No. 4:22-CV-01243, 2023 WL 9052106 (M.D. Pa. Dec. 29, 2023).

Easley alleges that despite "reach[ing] every benchmark to get his phase," including completion of group sessions, receiving no misconducts,

keeping his cell clean, and documentations of "progress made" on his treatment plan, Rowe, Miller, Woodring, and Salamon repeatedly denied his phase advancement. Easley contends that these denials were "due to [Easley] winning a settlement . . . [and] filing grievances . . . which defendants have stated on numerous occasions."

On an unspecified date, Rowe allegedly said that Easley would be "denied his phase [because] filing grievances is negative behavior and [Easley] will make it harder on himself if he continues to file grievances." On May 4, 2023, he allegedly told Easley that he was "not ready for his phase advancement due to [Easley] filing a grievance about a mental health issue." Later, he told Easley: "[Y]our settlement won't work here." On October 24, 2023, Miller allegedly said "if it was up to me you would go to phase 2 on a modification and never come out of cuffs."

In addition, Defendants Lansberry, Durst, and Bowman allegedly "conspired to" deny Easley's phase advancement, although Easley does not explain their involvement in the process. On March 12, 2024, Lansberry allegedly told Easley that "no matter what," he would not get

his phase advancement.[8] On May 22, Bowman said that Easley "would not get her vote for phase advancement due to [Easley] filing grievances, and self harm." On June 5, Bowman and Durst "told [Easley] he lost his phase . . . for having a mental health issue."

Ultimately, on August 8, 2024, Rowe told Easley he would be "failed out [of] the BMU program for 'filing over 120 grievances'": "You shouldn't [have] been put here[,] you [were] only sent here cause of your settlement and I made sure that did not work." Easley protested that he had not received a misconduct in months, to which Rowe allegedly replied: "You have to be treated different than everybody. Easley[,] you know that."

**E. Pending Lawsuit**

Easley has another lawsuit pending in this district against some of the defendants named here. Therein, he complained that since June 12, 2023, he had been "quarantined" and denied access to the prison yard and law library in retaliation for filing grievances. *See Easley v. Vogt*, No. 23-cv-01096 (M.D. Pa. filed June 30, 2023). He was ultimately permitted

---

[8] The context of this statement is unclear. Easley alleges: "Defendant Lansberry stated plaintiff '[man]ipulated by coming here due to settlement' which violates plaintiff['s] 'good faith' agreement." (Doc. 1, ¶ 58).

to proceed on First Amendment retaliation claims against Miller, Vogt, and a third defendant not named in this case. *See* No. 23-cv-01096 (Doc. 28) (M.D. Pa. Aug. 12, 2024).

## II. LEGAL STANDARDS

Under 28 U.S.C. § 1915A, the Court is obligated to screen any civil complaint in which a prisoner seeks redress from a governmental entity or an officer or employee of a governmental entity. 28 U.S.C. § 1915A; *James v. Pa. Dep't of Corr.*, 230 Fed. App'x 195, 197 (3d Cir. 2007). The Court has a similar obligation with respect to actions brought in forma pauperis and actions concerning prison conditions. *See* 28 U.S.C. § 1915(e)(2)(B)(i); id. § 1915(e)(2)(B)(ii); 42 U.S.C. § 1997e(c)(1); *see generally Banks v. Cty. of Allegheny*, 568 F. Supp. 2d 579, 587-89 (W.D. Pa. 2008) (summarizing prisoner litigation screening procedures and standards).

The legal standard for dismissing a complaint for failure to state a claim under § 1915A(b)(1), § 1915(e)(2)(B)(ii), or § 1997e(c) is the same as that for dismissing a complaint pursuant to Rule 12(b)(6). *Brodzki v. Tribune Co.*, 481 Fed. App'x 705, 706 (3d Cir. 2012) (per curiam); *Mitchell v. Dodrill*, 696 F. Supp. 2d 454, 471 (M.D. Pa. 2010); *Banks*, 568 F. Supp.

2d at 588. "Under Rule 12(b)(6), a motion to dismiss may be granted only if, accepting all well-pleaded allegations in the complaint as true and viewing them in the light most favorable to the plaintiff, a court finds the plaintiff's claims lack facial plausibility." *Warren Gen. Hosp. v. Amgen Inc.*, 643 F.3d 77, 84 (3d Cir. 2011) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007)). In deciding the motion, the Court may consider the facts alleged on the face of the complaint, as well as "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). Although the Court must accept the fact allegations in the complaint as true, it is not compelled to accept "unsupported conclusions and unwarranted inferences, or a legal conclusion couched as a factual allegation." *Morrow v. Balaski*, 719 F.3d 160, 165 (3d Cir. 2013) (quoting *Baraka v. McGreevey*, 481 F.3d 187, 195 (3d Cir. 2007)). The Court also disregards allegations made only in a prior complaint, *see Argentina v. Gillette*, 778 F. Appx 173, 175 n.3 (3d Cir. 2019), and any new factual allegations made in the brief opposing the motion to dismiss, *see Hughes v. United Parcel Serv., Inc.*, 639 F. App'x 99, 104 (3d Cir. 2016) (citation omitted).

Easley asserts claims under 42 U.S.C. § 1983. Section 1983 provides in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983. To establish a Section 1983 claim, a plaintiff must establish that the defendants, acting under color of state law, deprived the plaintiff of a right secured by the United States Constitution. *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1141 (3d Cir. 1995). To avoid dismissal for failure to state a claim, a civil rights complaint must state the conduct, time, place, and persons responsible for the alleged violations. *Evancho v. Fisher*, 423 F.3d 347, 353 (3d Cir. 2005). Further, "[c]ivil rights claims cannot be premised on a theory of *respondeat superior*. Rather, each named defendant must be shown . . . to have been personally involved in the events or occurrences which underlie a claim." *Millbrook v. United States*, 8 F. Supp. 3d 601, 613 (M.D. Pa. 2014) (citation omitted). As explained by the Third Circuit Court of Appeals:

> A defendant in a civil rights action must have personal involvement in the alleged wrongs . . . . [P]ersonal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence. Allegations of participation or actual knowledge and acquiescence, however, must be made with appropriate particularity.

*Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988).

## III.  DISCUSSION

Easley lists at least twelve different theories of relief, some of which overlap, and he does not clearly state which claims are intended against which defendants. Noting that *pro se* pleadings must be liberally construed, *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), the Court finds that the complaint supports the following claims for relief.

### A. Retaliation

To state a prima facie case of First Amendment retaliation, a plaintiff must show that (1) he was engaged in constitutionally protected conduct, (2) he suffered an "adverse action" by prison officials sufficient to deter a person of ordinary firmness from exercising his First Amendment rights, and (3) the protected conduct was a "substantial or motivating factor" in the prison officials' decision to take the adverse action. *Wisniewski v. Fisher*, 857 F.3d 152, 156 (3d Cir. 2017) (quoting *Newman v. Beard*, 617 F.3d 775, 781 (3d Cir. 2010)).

"[T]he filing of grievances and lawsuits against prison officials constitutes constitutionally protected activity" for purposes of a retaliation claim. *See Mearin v. Vidonish*, 450 F. App'x 100, 102 (3d Cir. 2011). Causation can be shown through "unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action," or "a pattern of antagonism coupled with timing to establish a causal link." *Watson v. Rozum*, 834 F.3d 417, 424 (3d Cir. 2016). In some cases, causation can be established "from the evidence gleaned from the record as a whole." *Id.* "An adverse consequence 'need not be great in order to be actionable[;]' rather, it need only be 'more than de minimis.'" *Watson*, 834 F.3d at 423 (quoting *McKee v. Hart*, 436 F.3d 165, 170 (3d Cir. 2006)) (alterations in original).

Based on the alleged remarks of various defendants, the complaint supports an inference that Miller, Rowe, and Woodring placed Easley in a hard cell[9] because he had filed grievances; that Vogt denied Easley

_____

[9] Although "the law is unsettled as to whether the placement of an inmate in a dirty, unsanitary cell for several days constitutes an adverse action for the purposes of a retaliation claim," the complaint plausibly suggests that these conditions could have deterred a person of ordinary firmness from exercising his First Amendment rights. *See Hagan v. Mason*, No. 1:19-CV-2120, 2021 WL 4502236, at *8 (M.D. Pa. Sept. 30, *(continued on next page)*

"exercise"[10] while he was in a restraint chair because Easley had previously sued him; and that Durst and Bowman denied Easley a BMU phase adjustment to which he was otherwise entitled at least in part because of his grievances. Thus, Easley may proceed on retaliation claims against these six defendants.[11]

However, Easley states no other viable retaliation claims.[12] In particular, while Davis, the mental health nurse practitioner, allegedly

---

2021); *see also Kapellusch v. Schnell*, No. 1:23-CV-00226-SPB-RAL, 2024 WL 5319116, at *7 (W.D. Pa. Dec. 5, 2024), report and recommendation adopted, 2025 WL 72794 (W.D. Pa. Jan. 10, 2025).

[10] Courts treat time in a restraint chair without relief more seriously than denial of "exercise" as that term is more commonly understood. *See, e.g., Young v. Martin*, 801 F.3d 172, 182 (3d Cir. 2015) (14 consecutive hours in a restraint chair constituted excessive force). Thus, the complaint suggests a factual question as to whether Easley's six hours in a restraint chair without relief amounts to an adverse action by Vogt.

[11] Although there are multiple potential theories of retaliation against certain defendants, the Court's task at the screening stage is simply to assess whether the complaint states any viable retaliation claim against each defendant.

[12] Easley's bare allegations that retaliatory actions were taken at the "direction" of certain defendants, without a factual basis showing retaliatory motive or involvement in the underlying activity, are also insufficient. *See Morrow*, 719 F.3d at 165 (a plaintiff is not entitled to conclusions or inferences unsupported by the facts in the complaint).

accused Easley of "trying to sue [her]," that does not support an inference that she denied medical care in retaliation for a lawsuit. Rather, Davis's alleged remarks indicate that at the time, she believed Easley's complaints of suicide were not genuine. (*See*, *e.g.*, Doc. 1 ¶ 260 ("I know your game. If you was suicidal you wouldn[']t be here.")). Although some of the remarks attributed to Davis are deplorable, they are not themselves adverse actions. *See Revell v. City of Jersey City*, 394 F. App'x 903, 906 (3d Cir. 2010) ("Courts have declined to find adverse action where the alleged retaliatory acts were criticism, false accusations or verbal reprimands.") (quotation and citation omitted); *Burgos v. Canino*, 358 F. App'x 302, 306 (3d Cir. 2009).

### B. Conditions of Confinement/ADA

Next, the Court considers claims arising from Easley's conditions of confinement. The Eighth Amendment "prohibits any punishment which violates civilized standards and concepts of humanity and decency," including conditions that deprive prisoners of "the minimal civilized measure of life's necessities." *Thomas v. Tice*, 948 F.3d 133, 138 (3d Cir. 2020) (quoting *Wilson v. Seiter*, 501 U.S. 294, 299 (1991)).

Regarding the unsanitary conditions[13] in Easley's cells, the complaint suggests that Easley complained to defendants Salamon, Rowe, Woodring, and Miller in sufficient detail to infer that they "actually knew of and disregarded" these conditions. *Thomas*, 948 F.3d at 138. Thus, he states Eighth Amendment claims against those defendants. However, Easley's related complaints to other officers, as he describes them, are too vague to state a claim. Easley allegedly complained to Seymore "about air quality" and that it was "freezing cold," but neither this vague description nor Seymore's response ("You're at an old jail, what do you expect") suggests Seymore's awareness of a constitutional violation. Moreover, there is no indication that Seymore (identified only as a "lieutenant") had independent knowledge or responsibility regarding

---

[13] Although there is no precise standard for when unpleasant or unsanitary conditions become an Eighth Amendment violation, "[i]t is clear under *Wilson* that extreme cell temperatures may satisfy the objective deprivation requirement . . . if warranted by the surrounding circumstances," which is "often an issue to be determined by the trier of fact." *Forshey v. Huntingdon Cnty.*, No. 1:13-CV-00285, 2016 WL 7743050, at *3 (M.D. Pa. Dec. 9, 2016) (citing *Sampson v. Berks Cty. Prison*, 171 Fed. Appx. 382, 385 (3d Cir. 2006)). The same is true of exposure to urine and feces. *See, e.g., Henry v. Overmyer*, No. CIV.A. 10-189, 2013 WL 3177746, at *2 (W.D. Pa. June 24, 2013) ("Sanitation is one of the basic human needs recognized by Eighth Amendment cases . . . [and] exposure to human waste carries particular weight in the conditions calculus.") (quotations and citations omitted).

the conditions in Easley's cell. The allegation that Vogt was "well aware" that Easley found the air in his cell "difficult to breathe" is insufficient for the same reasons. Easley allegedly made a complaint to "Fire and Safety" about "vents and lack of air circulation," but assuming the complaint reached the defendant Easley identifies as "Fire and Safety John Doe," this bare allegation does not show awareness of unconstitutional conditions.

Easley also alleges that Frank placed him on a "finger food diet restriction" in a hard cell, but he does not plead facts showing that Frank knew this was contrary to a medically prescribed diet. Easley alleges he received the wrong meals for seven days, but he does not allege how Frank was responsible for his diet when he left the hard cell after three days. The relatively brief period during which Easley received the wrong meals does not itself demonstrate Frank's deliberate indifference. *See*, *e.g.*, *Tenon v. Dreibelbis*, 606 F. App'x 681, 685 (3d Cir. 2015) (defendant's knowledge that plaintiff was temporarily receiving the wrong diet due to a "paperwork" error did not show deliberate indifference).

Finally, Easley plausibly alleges that Mauk failed to assign him a safe shower facility despite knowing of his foot injuries and resultant

inability to stand. Thus, Easley has stated a viable Eighth Amendment claim against Mauk[14]. *See Muhammad v. Dep't of Corr.*, 645 F. Supp. 2d 299, 316-18 (D.N.J. 2008) ("[T]he failure to provide handicapped accessible bathroom facilities may give rise to [an Eighth Amendment] claim.") (listing examples), aff'd, 396 F. App'x 789 (3d Cir. 2010).

Easley's shower allegations also support a viable claim under the ADA.[15] Because there is no liability for individual defendants under the ADA, that claim will only proceed against Salamon, the Superintendent, in her official capacity. *See Kokinda v. Pennsylvania Dep't of Corr.*, 779 F.

---

[14] Salamon and Doe 10 were allegedly aware or "should have known" of Easley's need for a "handicap shower," but Easley does not allege that they knew he was given the wrong shower or that they were responsible for assigning showers, so this claim is not viable against those defendants.

[15] For an ADA claim, Easley must plausibly allege "that he is a qualified individual with a disability, who was precluded from participating in a program, service, or activity, or otherwise was subject to discrimination, by reason of his disability." *Durham v. Kelley*, 82 F.4th 217, 225 (3d Cir. 2023). Easley's complaint supports an inference that his foot issues constituted a "disability," because they severely limited his ability to walk, and that he was denied reasonable access to a shower because of that disability. *See id.* at 225 ("Refusing to make reasonable accommodations is tantamount to denying access . . . [P]ain caused Durham to have trouble ambulating, and the failure to accommodate his requests [for a shower chair] kept him from accessing the showers on the same basis as other inmates.").

App'x 938, 942 (3d Cir. 2019); *Miller v. Little*, No. 22-CV-4264, 2023 WL 3674336, at *8 (E.D. Pa. May 25, 2023) ("Generally, the proper defendant for a Title II ADA claim is the public entity or an individual who controls or directs the functioning of the public entity.").

### C. Excessive Force/Failure to Intervene

The Eighth Amendment also prohibits prison officials from unnecessarily and wantonly inflicting pain in a manner that offends contemporary standards of decency. *See Hudson v. McMillian*, 503 U.S. 1, 8 (1992). For an excessive force claim, the force must be objectively more than *de minimis*, and the Court must determine whether the "force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Ricks v. Shover*, 891 F.3d 468, 480 (3d Cir. 2018) (citations omitted). Easley's allegations support claims of excessive force against Weber, Smith, Burns, MacIntyre, Vogt, Sheesley, Fye, Thompson, Tom, Bagrosky, and John Does 1 through 9.

An officer may be liable for failure to intervene in excessive force against a prisoner if the attending officer "had a reasonable opportunity to intervene and simply refused to do so." *See Smith v. Mensinger*, 293 F.3d 641, 650-51 (3d Cir. 2002). Defendants Stryker, Hummel, and Groth

allegedly declined "many opportunities" to stop the alleged 60-80 minute assault of Easley in the infirmary, and McKaulley was "10 feet away watching but waited 15-20 minutes" to relieve Easley after he was sprayed with O/C spray. These facts are sufficient to support claims of failure to intervene against these defendants. However, Easley's conclusory statements that various defendants "failed to intervene" or "failed to protect" him during other incidents of excessive force are insufficient to show that they had a "reasonable opportunity" to intervene and refused to do so. *See*, *e.g.*, *Howard v. Hollenbaugh*, No. 1:20-CV-00845, 2021 WL 602722, at *5-6 (M.D. Pa. Feb. 16, 2021).

### D. Medical Care

Next, Easley asserts a series of claims related to his medical care. First, he appears to assert that he was improperly forced to accept medical treatment during his hunger strike. He does not specify what medical treatment he received, other than checking his vital signs. "[C]onvicted prisoners . . . retain a limited right to refuse treatment and a related right to be informed of the proposed treatment and viable alternatives. The scope of the right to refuse treatment, however, must be circumscribed by legitimate countervailing State interests." *White v.*

*Napoleon*, 897 F.2d 103, 113 (3d Cir. 1990) (internal citations omitted). These legitimate interests include "preserving inmates' lives when they are on hunger strikes by mandating medical treatment . . . to assess their vital signs and to determine whether nutritional augmentation is needed." *Lee v. Bradley*, No. 1:21-CV-1503, 2021 WL 5112274, at *10 (M.D. Pa. Nov. 3, 2021); *see also Alston v. Little*, No. 24-CV-1574, 2024 WL 3071064, at *2-4 (E.D. Pa. June 20, 2024) (allegation that defendants "attacked [the plaintiff] with pepper spray and tasers, then put him in a restraint chair secured by handcuffs . . . [and] held him down to take his vital signs" was insufficient). Thus, the complaint does not suggest a plausible claim for relief based on unnamed defendants assessing his vital signs.

Turning to Easley's mental health care, two Eighth Amendment standards potentially apply. A plaintiff can allege deliberate indifference to a serious medical need by showing that (1) he had a serious medical need, (2) the defendant was deliberately indifferent to that need; and (3) the deliberate indifference caused harm to the plaintiff. *See Durham*, 82 F.4th at 229. In the context of prison suicide specifically, Easley must allege (1) a "particular vulnerability to suicide," meaning more than a

"mere possibility" that he would attempt it; (2) that "the prison official knew or should have known" of that vulnerability; and (3) "the official acted with reckless or deliberate indifference, meaning something beyond mere negligence." *Beers v. Cnty. of Northumberland*, No. 23-2555, 2024 WL 2874283, at *2 (3d Cir. June 7, 2024) (quoting *Palakovic v. Wetzel*, 854 F.3d 209, 223-24 (3d Cir. 2017)).

By either standard[16], Easley has plausibly asserted Eighth Amendment claims against Davis, Durst, and Bowman based on their responses to his incidents of self-harm. However, he has not stated any claim against Erin Smith or Nurse Dawn, to whom he allegedly voiced suicidal thoughts. The complaint does not show how these thoughts suggested a "strong likelihood" of suicide, nor indicate that either defendant was aware of Easley's history of suicide attempts. *See Colburn*

---

[16] There is some ambiguity as to which standard is appropriate when a claim is premised on self-harm or an unsuccessful suicide attempt. *Compare Smith v. Mason*, No. 3:25-CV-737, 2025 WL 1523004, at *3 (M.D. Pa. May 28, 2025) (applying the standard for suicide claims where the plaintiff alleged self-harm and "severe physical injury") *with Myers v. Clinton Cnty. Corr. Facility*, No. 3:21-CV-00867, 2022 WL 773916, at *2 (M.D. Pa. Feb. 22, 2022) (reasoning that a claim from an unsuccessful suicide attempt should be analyzed as deliberate indifference to a serious medical need), report and recommendation adopted in part, 2022 WL 738740 (M.D. Pa. Mar. 11, 2022).

*v. Upper Darby Twp.*, 946 F.2d 1017, 1024 (3d Cir. 1991) (deliberate indifference requires disregard for "a strong likelihood . . . that self-inflicted harm will occur").[17]

Easley also asserts unspecified claims of negligence; the Court construes him as asserting claims of medical negligence against these five defendants. *See* 42 Pa. Con. Stat. Ann § 8522(b)(2) (recognizing an exception to sovereign immunity for negligent acts of "health care employees of Commonwealth agency medical facilities or institutions or . . . health care personnel"). Although insufficient for an Eighth Amendment claim, Smith and Nurse Dawn's statements support a plausible inference that they were in some way responsible for his mental health care and potentially breached a duty to provide an appropriate standard of care by failing to address his suicidal ideation, leading to subsequent suicide attempts on the same day. *See Azaravich v. Wilkes-Barre Hosp. Co.*, LLC, 318 A.3d 876, 882 (Pa. Super. Ct. 2024) (a medical

---

[17] Easley states no viable claim based on supervisory defendants' inaction during the March 2023 suicide "cluster" at SCI-Rockview. Aside from a general violation of "policy," he does not allege that any of these defendants knowingly disregarded a specific need for him to be visited by health care staff, nor does he plausibly allege a connection between errors in March 2023 and his suicide attempts more than one year later.

negligence claim turns on "a determination of the standard of care . . . [and] a determination of whether the defendant [] met that standard").

### E. Remaining Claims

Easley asserts a variety of other claims, but none have merit as pled:

- He asserts a Fourteenth Amendment equal protection claim, but he has not alleged facts showing that he was treated differently from "similarly situated" prisoners.[18] *See Small v. Sec'y Pennsylvania Dep't of Corr.*, 592 F. App'x 62, 64 (3d Cir. 2014).

- He asserts state law claims of negligence and breach of contract, but aside from the medical negligence claims recognized above, and other exceptions not applicable here, Pennsylvania employees retain sovereign immunity from such claims. *See Williams v. Rivello*, No. 1:24-CV-01078, 2025

---

[18] Rowe's alleged comment that Easley "[had] to be treated different than everybody" does not substitute for factual allegations comparing Easley to *similarly situated* individuals; *i.e.*, those who were "alike in all relevant aspects." *See Jones v. Sposato*, 783 F. App'x 214, 218 (3d Cir. 2019).

WL 1699351, at *9 (M.D. Pa. June 17, 2025); *Talley v.*
*Pennsylvania Dep't of Corr.*, No. 19-CV-1589, 2024 WL
1253626, at *11-14 (E.D. Pa. Mar. 21, 2024); 42 Pa. Con. Stat.
Ann § 8522.

- He asserts a "failure to train," apparently based on various
  defendants' alleged failure to follow prison policies, but the
  complaint provides no factual basis for that causal link, nor
  does it indicate how the training was inadequate.

## IV. CONCLUSION

For the reasons described above, Easley will be permitted to
proceed on the following claims:

1.  First Amendment retaliation claims against Miller, Rowe,
Woodring, Vogt, Durst, and Bowman;

2.  Eighth Amendment conditions of confinement claims against
Mauk, Salamon, Rowe, Woodring, and Miller;

3.  An ADA claim against Salamon in her official capacity;

4.  Eighth Amendment excessive force claims against Weber,
C.O. Smith, Burns, MacIntyre, Vogt, Sheesley, Fye, Thompson, Tom,
Bagrosky, and Does 1 through 9;

5.      Eighth Amendment failure to intervene claims against Stryker, Hummel, Groth, and McKaulley;

6.      Eighth Amendment deliberate indifference claims premised on inadequate medical care offered by Davis, Durst, and Bowman; and

7.      State law medical negligence claims against Davis, Durst, Bowman, Erin Smith, and Nurse Dawn.

An appropriate order follows.


Dated: August 13, 2025                    *s/Joseph F. Saporito, Jr.*
                                          JOSEPH F. SAPORITO, JR.
                                          United States District Judge